**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PHYLLIS MANGUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:20-CV-540 |
| | ) | |
| UNITED STATES STEEL | ) | |
| CORPORATION D.B.A. GRANITE | ) | |
| CITY STEEL CORPORATION, | ) | |
| | ) | |
| Defendant. | | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

### BACKGROUND

Plaintiff Phyllis Mangum ("Plaintiff") is a black female who brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, *et seq.* Mangum claims her former employer, United States Steel Corporation ("U.S. Steel"), discriminated against her based on her race and gender and retaliated against her for reporting the discrimination.

On June 22, 2021, U.S. Steel filed a motion for summary judgment on the merits of Mangum's claims (Docs. 34-36). On July 26, 2021, Mangum filed a response in opposition to the summary judgment motion and a statement of additional facts (Docs. 39 & 40). On August 19, 2021, U.S. Steel filed a reply in support of its summary judgment motion (Doc. 45) and a response to Mangum's statement of additional facts (Doc. 46).

For the reasons outlined below, the summary judgment motion is granted in part and denied in part. Specifically, it is granted as to Mangum's retaliation claims and denied as to Mangum's discrimination claims.

## UNDISPUTED MATERIAL FACTS

The following material facts are not genuinely disputed.[1] Defendant U.S. Steel is a steel manufacturer that produced hot-rolled, cold-rolled, and coated steel products for customers to use in construction, containers, piping and tubing, automobiles, and other industries (Doc. 35-1). U.S. Steel operates a facility known as "Granite City Works" in Granite City, Illinois ("Granite City Facility") (*Id.*). One of the departments at the Granite City Facility is the Hot Strip Mill Department. In the Hot Strip Mill Department, employees are involved in taking large, flat rectangular pieces of steel and forming them into steel circles/coils (Doc. 35-1) (Doc. 35-2, p. 25) (Doc. 35-3, p. 8 & 10-11). The Hot Strip Mill is a twenty-four (24) hour, seven (7) day a week, continuous operation (Doc. 35-3, p. 11).

Phyllis Mangum is an African-American female (Doc. 35-2, p. 115). She was employed at the Granite City Facility from July 2018 to October 9, 2019 (*Id.* at p. 34). Mangum was a Shift Manager in the Hot Strip Mill Department (*Id.* at p. 25). A Shift Manager is also known as a "Roller" (Doc. 35-3, p. 15).

---

[1] U.S. Steel's motion for summary judgment contains statements of facts and argument related to Mangum's perceived cause of action for a hostile work environment. However, Mangum concedes in her opposition to the motion that she is not proceeding under a hostile work environment claim (Doc. 40, p. 9-10). Thus, the Court does not address U.S. Steel's related arguments or include the supporting statements of fact in this Memorandum and Order.

Joe Spanberger ("Spanberger") has been employed with U.S. Steel for more than twenty-five (25) years at the Granite City Facility (Doc. 35-1) (Doc. 35-4, p. 6). Spanberger has held the positions of Shift Manager, Process Coordinator and Operations Manager in the Hot Strip Mill (Doc. 35-4, p. 6 & 11). When Mangum began her employment with U.S. Steel, Spanberger held the position of Process Coordinator (*Id.* at p. 9). As Process Coordinator, Spanberger was the direct supervisor of Shift Managers, including Mangum (*Id.* at p. 9-10).

In October 2018, Spanberger was promoted to the position of Operations Manager of the Hot Strip Mill Department (*Id.* at p. 6-7). At Spanberger's promotion to Operations Manager, Jordan McBride ("McBride") was hired to fill the Process Coordinator position made available by Spanberger's promotion (Doc. 35-4, p. 1 & 16-17) (Doc. 35-4, p. 7). McBride has continued in the position of Process Coordinator since November 2018 (Doc. 35-3, p. 7-8). McBride worked for U.S. Steel from 2006 to 2015, then left U.S. Steel before coming back to the company in November 2018 for the Process Coordinator position (*Id.* at p. 14-16).

For a three or four-year period between 2006 and 2015, McBride was a Shift Manager of the Hot Strip Mill Department (*Id.* at p. 15). From November 2018 to the conclusion of Mangum's employment with U.S. Steel, McBride supervised all Shift Managers, including Mangum (*Id.* at p. 104). Since November 2018, Spanberger has been McBride's direct supervisor (Doc. 35-4, p. 14).

During Mangum's employment, she was one of four Shift Managers in the Hot Strip Mill Department (Doc. 35-2, p. 26). Shift Managers' duties include managing the

day-to-day activities in the Hot Strip Mill Department (*Id.* at p. 25). Depending on the shift worked, Shift Managers are responsible for anywhere from 35 to 100 subordinate employees (*Id.* at p. 31-33). The four Hot Strip Mill Shift Managers during Mangum's employment at U.S. Steel were Emmett Callaway (black male); Marty Steinmeyer (white male); Brian Jarvis (white male); and Mangum (black female) (*Id.* at p. 26-27 & 31).

U.S. Steel operates a corporate ethics and compliance program grounded in the S.T.E.E.L. Principles (Doc. 35-1) (Doc. 35-9). Mangum was trained on the S.T.E.E.L. Principles at U.S. Steel (Doc. 35-2, p. 45). The S.T.E.E.L. Principles set expectations for U.S. Steel employees worldwide (Doc. 35-9). The "S" in S.T.E.E.L. stands for "Safety First" (Doc. 35-2, p. 44) (Doc. 35-9).

The Hot Strip Mill Department is a dangerous work environment if employees do not follow proper procedures (Doc. 35-2, p. 50). In the event employees fail to follow standard operating procedures, an employee can be seriously injured or killed on the job (Doc. 35-1). Standard operating procedures require employees to lock out certain machinery when it is being inspected or worked on (Doc. 35-1) (Doc. 35-2, p. 52). Locking out prevents the machinery from unintentionally moving and/or energizing, and is, therefore, a key protocol for avoiding injuries to employees (Doc. 35-1).

Spanberger and McBride regularly discussed Mangum's job performance during her employment with U.S. Steel (Doc. 35-1) (Doc. 35-3, p. 70). McBride stated that of the four Shift Manager he supervised, Mangum was the "weakest link" and had the least grasp on the U.S. Steel standards (Doc. 35-3, p. 17-18 & 20-21). However, Mangum testified that two other Shift Managers, Steinmeyer and Jarvis, routinely created safety

issues that she reported to McBride and Spanberger (Doc. 39-1, p. 47). Further, Mangum testified she knew many of U.S. Steel's standards very well and asked for help when she needed additional understanding (*Id.* at p. 58). Additionally, Spanberger could only recall two times that Mangum could not remember a standard and he stated that he and other managers could not recall all of the standards from memory (Doc. 39-3, p. 33 & 35).

McBride testified that Mangum was "dangerous" and he was concerned that her safety performance would cause injury or death (Doc. 35-3, p. 88). On August 2, 2019, Spanberger emailed the Granite City Facility Coordinating Manager of Employee Relations, Lydia Kachigian ("Kachigian") the following message: "I have some questions about starting a PIP with Phyllis [Mangum]. I spent a lot of time today observing her as she performed her normal duties. I think she might be worse than I thought about understanding her role" (Doc. 35-1) (Doc. 35-5).

On August 5, 2019, Spanberger sent Kachigian an email, with the subject line "Phyllis Mangum PIP," that included a list of performance issues involving Mangum (Doc. 35-6). The list included:

1. Has no mechanical or electrical understanding

2. Does not know the process SOP, QSOP, SJP.

3. Has had complaints against her concerning assigning labor work safely.

4. Makes excuses when being corrected or bringing up issues.

5. Not showing up to the area when the mill is down to understand the issue.

6. Does not have a since [sic] of urgency with upset conditions.

7. Does not interact with employees when they are performing their duties incorrectly.

8. Needs to spend more time walking and learning the mill.

9. Needs to spend more time learning the operators['] duties.

10. Must ask questions when in doubt of the correct way to perform her duties, instead of struggling or making the wrong decision.

11. She is abrasive to certain individuals that work for her.

12. She doesn't know employee names, clock numbers, or job positions, and struggles with the times system.

(*Id.*).

With respect to issue (1), Spanberger testified he did not believe it was dangerous for a Shift Manager not to have any mechanical or electrical understanding (Doc. 39-3, p. 28).

In response to issue (2), Mangum testified she knew some of the SOPs, QSOPs, and SJPs "very well" and contacted millwrights or electrical managers when she needed more help understanding (Doc. 39-1, p. 58). Further, Mangum worked at U.S. Steel for the shortest period of time of all of the four Shift Managers (Doc. 35-2, p. 17 & 20) (Doc. 35-3, p. 32-33).

Also, concerning issue (3), Spanberger testified none of the safety complaints identified in the email were ever verified as accurate (Doc. 39-3, p. 38).

Concerning issue (4), Mangum denied that she ever made excuses for her alleged deficiencies (Doc. 39-1, p. 60) and Spanberger could not recall any of Mangum's excuses at his deposition (Doc. 39-3, p. 39 & 40).

With respect to issues (5) and (6), Mangum testified she "always responded to issues in the mill" and "always contacted the millwrights to understand" the issue (Doc. 39-1, p. 61). Spanberger could not identify a specific date where Mangum failed to respond to a mill issue (Doc. 39-3, p. 40). He did testify that on one occasion Mangum did not respond for two hours, but Spanberger and McBride were already addressing the issue (Doc. 39-3, p. 41 & 42).

Concerning issue (7), Mangum could not recall any instance where she failed to interact with an employee performing a task incorrectly (Doc. 39-1, p. 61-62).

As to issue (8), Mangum testified she spent 95% of her time walking the floor (Doc. 39-1, p. 62).

In response to issue (10), Mangum testified she sought help when she did not understand her duties and would call Spanberger or McBride for help (Doc. 39-1, p. 64). Also, McBride testified Mangum called him when she did not understand an issue (Doc. 39-2, p. 49-50).

As to issue (11), Mangum was not made aware of a complaint about her being "abrasive" (Doc. 39-1, p. 50 & 64).

Finally, with respect to issue (12), Mangum testified she did not have difficulty knowing the names and positions of individuals on her shift and did not struggle with the time system (Doc. 39-1, p. 65-66).

On August 5, 2019, Kachigian sent Spanberger a draft of a performance improvement plan ("PIP") (Doc. 35-4). On August 9, 2019, Kachigian, Spanberger and McBride gave Mangum a copy of the PIP and conducted an in-person review of the PIP with Mangum at the Granite City Facility (Doc. 35-2, p. 68-70 & 86) (Doc. 35-4, p. 53) (Doc. 35-7). At the PIP meeting, Kachigian read the PIP to Mangum word-for-word as Mangum followed along with her (Doc. 35-2, p. 70). The PIP addressed (1) Safety; (2) Proper Execution of Duties; (3) Teamwork; and (4) Communication (Doc. 35-7). The "action plan" of the PIP required Mangum to "demonstrate[] a thorough understanding of [Standard Operating Procedures,]" and "assure safety aspects of the jobs are understood and that safety responsibilities are accomplished and communicated" (*Id.*). The term of the PIP was 60 days, but it could "be discontinued prior to the 60 days if sufficient progress is not being made" (*Id.*). Mangum understood from the PIP and the initial meeting on August 9, 2019 with the U.S. Steel representatives that if they determined or felt that she did not improve in these areas, she would be subject to termination (Doc 35-2, p. 73).

Standard operating procedures require Shift Managers to submit lock out/tag out paperwork at the conclusion of each job so anyone working on the job or in the area knows what is locked out (Doc. 35-1). These forms are also used by the department for verification in case an issue should arise later (*Id.*).

Spanberger testified that on August 12, 2019, Mangum failed to submit lock out paperwork, which disrupted the department and caused work to stop (Doc. 35-4, p. 85-87). According to Mangum, while she was completing the paperwork, an employee came

into the office and told Mangum her "car was floating" due to extreme flooding in Granite City (Doc. 35-2, p. 86). Mangum immediately ran out to her vehicle and saw water "creeping up" her vehicle (*Id.* at p. 87). Mangum returned to the office, where her supervisor, McBride, was present, and she asked if there was "anything else anyone needs from me" (*Id.* at p. 87). No one responded affirmatively and Mangum left before completing the lock out paperwork (*Id.*). Mangum testified that the incomplete paperwork did not halt any work because everyone was "scrambling because of the flood" (*Id.* at p. 88). McBride testified that one of the gates to the facility was inaccessible due to flooding (Doc. 39-2, p. 37-38).

On August 13, 2019, McBride confronted Mangum over accusations that she entered a mill stand without being locked out (Doc. 35-2, p. 52-54). Spanberger attested that standard operating procedures require employees to lock out mill stands before entering them for any reason (Doc. 35-1). An employee who fails to lock out before entering a mill stand is at risk of having their body smashed or cut in half by a steel slab, being sprayed with water at 180 PSI, or falling into a hole (Doc. 35-3, p. 39-41).

Mangum testified that on August 13, she had reached "most of [her] body" into the mill to retrieve her lockbox key that she dropped while she was inspecting and unlocking the mill (Doc. 35-2, p. 53-54, 88-89). She testified "as far as the standard operating procedure, we go inside those mills all the time for inspection, or incidents of measurements that doesn't require you to lock down the entire mill" (*Id.* at p. 91). Mangum testified she was "pretty sure that it was still locked out" when she reached her

body in the mill (*Id.* at p. 92). Mangum stated she told McBride that she believed it was safe to retrieve the lock in those circumstances (Doc. 39-2, p. 89-90).

McBride offered to show Mangum the video footage of her entering the mill stand (Doc. 35-2, p. 93). Mangum responded that she did not have time to watch the video and that he should discipline her if she was guilty of reaching into the mill stand (*Id.* at p. 92-93).

McBride testified Mangum was being "abrasive" and "didn't receive help appropriately," and "there was no value" in continuing to spend time with Mangum (Doc. 35-3, p. 51-52). McBride testified Mangum was being "annoy[ing]" by "making phone calls and having people come look at stuff that one, didn't need to be made phonecalls about or didn't need to be locked out and we had gone over on numerous occasions before" (Doc. 39-2, p. 49-50).

On August 20, 2019, a follow up PIP meeting was held in person between Mangum, Kachigian, Spanberger and McBride (Doc. 35-2, p. 93-95). Spanberger completed a document titled "Action Plan For Employee Development Progress Form," which summarizes Mangum's alleged safety violations (Doc. 39-4). The document contains a section that states "EMPLOYEE is progressing sufficiently:" followed by a box next to "YES" and a box next to "NO" (Doc. 39-4). The box next to "YES" is marked and Spanberger signed the form (*Id.*).

A PIP meeting was scheduled to occur on August 28, 2019 (Doc. 35-2, p. 81). The August 28, 2019 PIP meeting did not occur because Mangum took medical leave from

work from August 25, 2019 to September 23, 2019 (Doc. 35-2, p. 42-43 & 98-100) (Doc. 35-3, p. 81) (Doc. 35-4, p. 57-58).

McBride alleged he witnessed Mangum standing on a holding table that was not locked out on October 8, 2019 (Doc. 35-2, p. 100). When an employee is on a holding table, standard operating procedure requires it to be locked out (Doc. 35-2, p. 102-103). An employee who fails to lock out a holding table is at risk of falling off into a flume of water twenty feet below the table, or into another piece of equipment and possibly being crushed (Doc. 35-1). Mangum testified the incident never occurred (Doc. 35-2, p. 101-02). She explained when she spoke to McBride, he did not accuse her of standing on a holding table that was not locked out (*Id.*). Instead, McBride accused her of not having the lock on her lock box, which was "also incorrect" (*Id.*). Mangum stated that when she was standing on the holding table on October 8, she did everything by standard operating procedure (*Id.* at p. 104).

On the morning of October 9, 2019, Mangum met in person with Kachigian, Spanberger and McBride at U.S. Steel for another PIP meeting (Doc. 35-2, p. 100-101, 104, & 108). Mangum testified that during the meeting, she explained that the October 8 incident did not occur and that she had lock out paperwork to confirm her version of events (Doc. 35-2, p. 104). Mangum testified that Kachigian stated at the meeting that no "offenses alleged were fireable offenses" (*Id.* at p. 109-110). During the PIP meeting, Mangum asked Kachigian, "this is a toxic environment and I would like to speak to someone about my concerns. To whom do I speak with?" (Doc. 39-1, p. 81). Kachigian

responded, "I am that person" and Mangum told her she did not want to speak in the presence of Spanberger or McBride because they "were part of the problem" (Doc. 39-1, p. 81-82). When asked to recall exactly what she said to Kachigian, Mangum testified that she stated, "I'd like to speak a [sic] someone about a volatile work environment and. . .I don't want Joe or Jorden present during this conversation" (*Id.* at p. 82-83).

According to Spanberger, he had decided to recommend Mangum for termination prior to the October 9 PIP meeting (Doc. 35-1) (Doc. 35-4, p. 72-73). Spanberger did not recommend that Mangum be terminated until after the PIP meeting (Doc. 39-3, p. 71). Spanberger testified he did not "want [Mangum] to get hurt" or "anybody that she is responsible for to get hurt because of her lack of safety. . . . I mean, she is in charge out here by herself at that time and I was not comfortable with her leading a crew of new laborers or anybody else with her lack of safety" (Doc. 35-4, p. 73). Spanberger attested that when Mangum worked the overnight shift, she was the only manager present in the Hot Strip Mill Department, and he became uncomfortable from a safety standpoint with her being in charge alone (Doc. 35-1). Also, Spanberger attested that if Mangum's performance issues were unrelated to safety, he would have considered extending her PIP (*Id.*).

At about 7 p.m. on October 9, 2019, prior to the start of her work shift, and after the termination recommendation had been approved, Kachigian and Spanberger met with Mangum in person and terminated her employment with U.S. Steel (Doc. 35-2, p.

110-11). The U.S. Steel Employee Termination Report states that Mangum was terminated because she "[d]id not successfully complete PIP" (Doc. 35-8).

Mangum claims she was terminated by her supervisors, Spanberger and McBride, based on her gender and/or race (Doc. 35-2, p. 114-15 & 124-25). Plaintiff claims that her supervisors, Spanberger and McBride, subjected her to "toxic work environment" discrimination during her employment based on her race and gender (Doc. 35-2, p. 115-16).

At Mangum's deposition, she identified the following incidents in support of her claims of toxic work environment: (a) McBride micro-managed her daily work activities; (b) McBride and Spanberger regularly contacted laborers following her communications with them to question what she had told them; (c) she overheard a co-worker (Steve Bates) hang up a telephone he was on with another employee and state "That bitch can suck my cock."; (d) Mangum's subordinates would not answer her radio calls, or comment "get some bass in your voice."; (e) A Millwright refused to work with her for unknown reasons; (f) "a lot of hearsay from Emmett [Callaway]" that another Shift Manager had referred to her as "Bitch," had said that "she doesn't fucking know her job," and insinuated she was having an affair with Callaway; (g) a calendar with women in swimsuits was hung up on the wall in a work office; and (h) McBride spoke with her in a demeaning and belittling manner (Doc. 35-2, p. 75-80).

At Mangum's deposition, she could not identify any written or verbal statement of overt racism or sexism by McBride or Spanberger (Doc. 35-2, p. 122). Mangum told McBride and Spanberger that Steve Bates offended her by using the term "cock" (Doc.

35-3, p. 56-57) (Doc. 35-4, p. 64-65). McBride and Spanberger testified they counseled Bates about vulgar language (Doc. 35-3, p. 56-57) (Doc. 35-4, p. 64-66). Mangum testified that Bates continued to use vulgar language after he was allegedly disciplined (Doc. 39-1, p. 77-78).

Mangum also claims that her supervisors (Spanberger and McBride) retaliated against her (Doc. 35-2, p. 122-23). Mangum testified that Spanberger and McBride retaliated against her for accusing them and other managers of not following safety protocol (Doc. 35-2, p. 122-24) and for offering to make a statement on behalf of Callaway for his discrimination claim (Doc. 39-1, p. 185). Mangum claims that her supervisors (Spanberger and McBride) retaliated against her by: (a) placing her on a PIP; and (b) terminating her employment (Doc. 35-2, p. 185). Mangum testified she "had every reason to believe that" her support for Callaway "had gotten back to" Spanberger and McBride because "in that environment, it seemed like nothing was confidential" (Doc. 39-1, p. 186). However, Mangum testified she did "not know for certain" whether Spanberger and McBride were aware that she offered to support Callaway (*Id.* at p. 186-87).

U.S. Steel maintains a Policy Manual containing a policy entitled "Discriminatory harassment" (the "Policy") (Doc. 35-10). Mangum was familiar with the Policy during her employment with U.S. Steel (Doc. 35-2, p. 172). The Policy defines "discriminatory harassment" (Doc. 35-10). Mangum acknowledged during her deposition that she claims to have been subjected to discriminatory harassment (as defined by the Policy) (Doc. 35-2, p. 172). Paragraph 9 of the Policy provides, "Any employee. . .who believes that he or she has been subjected to an act of discriminatory harassment, or has knowledge of such

conduct involving others, must promptly report such events in accordance with this Policy" (Doc. 35-10). The Policy dictates that reports made under the Policy be made as follows:

> if the report involves or implicates an employee's direct supervisor, the employee shall report the matter promptly to his or her direct supervisor's supervisor; his or her Employee Relations or Human Resources representative, or the U.S. Steel Ethics Line which can be accessed anonymously by telephone, online, through the U.S. Steel Intranet, or mail.

(*Id.*).

Mangum claims to have been subject to a toxic work environment by Spanberger and McBride throughout her entire employment with U.S. Steel (Doc. 35-2, p. 115-16 & 174-75). Mangum complained about a toxic work environment to Spanberger, McBride's supervisor (Doc. 39-1, p. 175) (Doc. 39-3, p. 14). Mangum did not complain to human resources personnel about the alleged toxic work environment until October 9, 2019, her last day of employment (Doc. 35-2, p. 175). Mangum had also called the anonymous employee complaint hotline to speak about a toxic environment and seek help (Doc. 39-1, p. 48-49). Mangum testified that she "can only assume that things would have been different, rather than [her] suffering the final retaliation of losing [her] job" if she had contacted the hotline the first time she experienced improper conduct (Doc. 39-1, p. 180). However, she testified she never thought she would be fired when she attempted to complain to human resources (*Id.* at p. 180-81).

Emmett Callaway was a Shift Manager at the Hot Strip Mill Department during Mangum's employment at U.S. Steel (Doc. 35-2, p. 26-27 & 31). Callaway is a male (*Id.*). Mangum claims to have witnessed discrimination against Callaway at U.S. Steel

throughout her period of employment with U.S. Steel (*Id.* at p. 187). Mangum testified to the following at her deposition:

> I felt I was discriminated against, because I was treated unfairly, which means that I was treated differently than the other supervisors, with the exception of Emmett [Callaway]. And you have two minority managers who were treated differently, when you have two Caucasian male employees or managers who were not held – or were not ridiculed or berated openly.

(Doc. 35-2, p. 121)

Mangum testified she witnessed her co-workers, Steinmeyer and Jarvis, and her supervisors violate safety rules (Doc. 39-1, p. 46-47). When Mangum reported safety violations to Spanberger, Spanberger told Mangum, "We're not talking about them, we're talking about you" (*Id.* at p. 46). Mangum also testified that Steinmeyer's and Jarvis's violations were treated as "a joke," while her alleged safety practices were "nit-pick[ed]" (*Id.* at p. 119-20). Spanberger testified that when he supervised Steinmeyer and Jarvis, they were not placed on a PIP (Doc. 39-3, p. 68).

Mangum also testified she witnessed McBride on the mill when it was not locked out (Doc. 39-1, p. 105). Mangum brought up McBride's safety violation during the October 9 meeting (*Id.*).

McBride testified that Mangum told him "from time to time" that she was treated unfairly because she was a black female (Doc. 46-1, p. 93). He stated it "was a common theme" for Mangum to discuss being a black woman (Doc. 39-2, p. 60). McBride testified Mangum never told him about a specific instance of her being treated unfairly because of her race or gender (Doc. 46-1, p. 93-94). When asked whether he understood Mangum's

complaints to mean "she was being treated unfairly at U.S. Steel or just generally in life,"
McBride testified, "I don't know." (*Id.*).

**DISCUSSION**

### A. Employment Discrimination

Title VII and the IHRA prohibit employers from discriminating against an
individual because of the individual's sex or race. 42 U.S.C. § 2000e-2(a)(1); 775 ILCS 5/1-
102(a).[2] When assessing summary judgment in an employment discrimination case, the
applicable standard is "whether the evidence would permit a reasonable factfinder to
conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused
the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834
F.3d 760, 765 (7th Cir. 2016). A plaintiff may utilize the *McDonnell Douglas* "burden-
shifting framework" to make this evidentiary showing. *See David v. Board of Trustees of
Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under *McDonnell
Douglas*, the plaintiff must establish a prima facie case of discrimination by establishing:
(1) she belongs to a protected class, (2) she performed her job according to the defendant's
legitimate expectations; (3) she suffered an adverse employment action, and (4) similarly
situated employees outside the protected class were treated more favorably. *McDaniel v.
Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019).

---

[2] The parties make no distinction between Mangum's Title VII based claims and her IHRA based claims.
Courts rely on the same standards and tests when assessing claims under both Title VII and the IHRA. *See,
e.g., Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017); *Volling v. Kurtz Paramedic Servs., Inc.*, 840
F.3d 378, 383 (7th Cir. 2016); *Zaderaka v. Ill. Human Rights Com.*, 545 N.E.2d 684, 687 (Ill. 1989). Thus, the
cases cited herein apply interchangeably to Mangum's Title VII and IHRA claims.

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination. *Id.* at 368. If the defendant supplies a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. *Id.* Even if the plaintiff proceeds under the *McDonnell Douglas* framework, the Court must still "assess the evidence as a whole" to determine whether a reasonable jury could find the plaintiff suffered an adverse employment action "because of" a proscribed factor. *Id.*

Turning to the *McDonnell Douglas* framework, U.S. Steel does not contest that Mangum belongs to a protected class as a black female, or that she suffered an adverse employment action when she was terminated from her employment. Additionally, U.S. Steel makes no argument as to whether Mangum was treated less favorably than similarly situated white employees. However, U.S. Steel argues it is entitled to summary judgment because it terminated Mangum for the non-discriminatory reason that she failed to meet legitimate performance expectations. Further, U.S. Steel argues Mangum's gender discrimination claim fails because she admitted at her deposition that she was not treated differently than her male co-worker.

As noted above, courts generally determine whether the plaintiff has established a prima facie case of discrimination and then analyze whether the defendant has provided a non-discriminatory and non-pretextual reason for the plaintiff's termination. But here, the question of pretext and job performance substantially overlap. "When the employer asserts as the nondiscriminatory reason for termination that the employee was

not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's prima facie case and the pretext analysis." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010); *see also Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996) ("[I]n many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its reasonable belief that the employee was not performing in an acceptable manner."). Thus, the Court will combine these questions and turn first to the similarly situated employee prong with respect to Mangum's gender discrimination claim.

### a. Similarly Situated Employees

U.S. Steel asserts Mangum's gender discrimination claim fails as a matter of law because Mangum admitted she was treated the same as Emmett Callaway, a similarly situated black male. Mangum testified to the following at her deposition:

> I felt I was discriminated against, because I was treated unfairly, which means that I was treated differently than the other supervisors, ***with the exception of Emmett [Callaway].*** And you have two minority managers who were treated differently, when you have two Caucasian male employees or managers who were not held – or were not ridiculed or berated openly.

(Doc. 35-2, p. 121) (emphasis added).

In response, Mangum argues U.S. Steel is misconstruing her deposition testimony. According to Mangum, she was only explaining that Callaway was also treated unfairly

in comparison to *white* employees. Mangum argues she faced additional discrimination that Callaway did not, based on her gender.

Mangum's testimony, and with the benefit of her explanation, is certainly open for interpretation. Although she stated she was treated unfairly "with the exception of [Callaway]", the statement was made while discussing race, not gender. Context is always important. And this context creates an ambiguity that the Court cannot resolve on summary judgment. This type of a question is for a jury. Accordingly, U.S. Steel's argument fails on this front.

### b.  Legitimate Expectations/Pretext

U.S. Steel argues it is entitled to summary judgment because Mangum was terminated for the nondiscriminatory reason that she failed to meet U.S. Steel's legitimate employment expectations. The inquiry into a plaintiff's job performance looks at her performance through the eyes of her supervisors at the time of her termination. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). The related pretext question asks "whether the employer honestly believed the reasons it has offered to explain the discharge. It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012).

Here, U.S. Steel contends that in July or early August, 2019, McBride identified Mangum as having a poor grasp on the U.S. Steel standards, and Spanberger concluded from his observations of Mangum that "she might be worse than I thought about

understanding her role" (Doc. 35-5) (Doc. 35-1). Thereafter, Spanberger compiled a list of concerns regarding Mangum's performance (Doc. 35-6). Mangum has testified, in detail, that each of the alleged deficiencies on Spanberger's list were either exaggerated or false. For example, Spanberger stated that Mangum needed to spend more time walking the mill (Doc. 35-6). However, Mangum testified she spent 95% of her time walking the mill (Doc. 39-1, p. 62). Spanberger also claimed Mangum needed to "ask questions when in doubt" (Doc. 35-6), but McBride testified Mangum called him too much and asked him too many questions (Doc. 39-2, p. 49-50). Also, Spanberger claimed Mangum's performance was deficient because she did not have an understanding of mechanical or electrical issues (Doc. 35-6). However, Spanberger testified he did not believe it was dangerous for a Shift Manager not to have any mechanical or electrical understanding (Doc. 39-3, p. 28).

On August 9, 2019, U.S. Steel made formal efforts to correct Mangum's alleged deficiencies by instituting a PIP (Doc. 35-7). U.S. Steel contends that even after the PIP was issued, Mangum put herself and other employees at risk by failing to follow safety protocols on three separate occasions.

Specifically, U.S. Steel says that on August 12, 2019, Mangum failed to submit lock out paperwork, which disrupted the department and caused work to stop. However, Mangum denies she violated procedure. She claims that while she was completing the paperwork, an employee came into the office and told Mangum her "car was floating" due to extreme flooding in Granite City (Doc. 35-2, p. 86). Mangum immediately ran out to her vehicle and saw water "creeping up" her vehicle (*Id.* at p. 87). She returned to the

office, where her supervisor, McBride, was present, and she asked if there was "anything else anyone needs from me" (*Id.* at p. 87). No one responded affirmatively and Mangum left before completing the lock out paperwork (*Id.*).  Mangum testified that the incomplete paperwork did not halt any work because everyone was "scrambling because of the flood" (*Id.* at p. 88).

Also, according to U.S. Steel, on August 13, 2019, McBride witnessed Mangum enter a mill stand without being locked out. Mangum testified that on August 13, she had reached "most of [her] body" into the mill to retrieve her lock box key that she dropped while she was inspecting and unlocking the mill (Doc. 35-2, p. 53-54, 88-89). She testified "as far as the standard operating procedure, we go inside those mills all the time for inspection, or incidents of measurements that doesn't require you to lock down the entire mill" (*Id.* at p. 91). Mangum testified she was "pretty sure that it was still locked out" when she reached her body in the mill (*Id.* at p. 92). She said she told McBride that she believed it was safe to retrieve the lock in those circumstances (Doc. 39-2, p. 89-90).

On August 20, 2019, Mangum met with Kachigian, Spanberger, and McBride to follow up with the PIP and discuss the alleged violations on August 12 and 13. Spanberger completed a document titled "Action Plan For Employee Development Progress Form," which summarizes Mangum's alleged safety violations (Doc. 39-4). The document contains a section that states "EMPLOYEE is progressing sufficiently:" followed by a box next to "YES" and a box next to "NO" (*Id.*). The box next to "YES" is marked and Spanberger signed the form (*Id.*).

According to U.S. Steel, on October 8, 2019, McBride witnessed Mangum standing on a holding table that was not locked out (Doc. 35-2, p. 100). Mangum, however, testified the incident never occurred (*Id.* at p. 101-02). She explained when she spoke to McBride, he did not accuse her of standing on a holding table that was not locked out (*Id.*). Instead, McBride accused her of not having the lock on her lock box, which was "also incorrect" (*Id.*). Mangum stated that when she was standing on the holding table on October 8, she did everything according to standard operating procedure (*Id.* at p. 104).

Further, Mangum testified she witnessed two white male Shift Managers, Marty Steinmeyer and Brian Jarvis, fail to lock out while on the mill (Doc. 39-1, p. 46-47). Steinmeyer and Jarvis occupied the same position as Mangum (Doc. 35-2, p. 26-27 & 31), they were supervised by the same supervisors as Mangum (Doc. 35-4, p. 9-10), and they were subject to the same safety protocols as Mangum (Doc. 35-1). However, when Mangum reported the safety violations to Spanberger, neither Steinmeyer nor Jarvis were placed on a PIP (Doc. 39-3, p. 68).

On October 9, 2019, Mangum met with Kachigian, Spanberger, and McBride for another PIP meeting (Doc. 35-2, p. 104). Mangum testified that during the meeting, she explained that the October 8 incident did not occur and that she had lock out paperwork to confirm her version of events (Doc. 35-2, p. 104). Mangum also says that she witnessed McBride, himself, enter a mill without being locked out (Doc. 39-1, p. 105). She testified that Kachigian stated at the meeting that no "offenses alleged were fireable offenses" (*Id.* at p. 109-110). However, U.S. Steel terminated Mangum later that day, upon Spanberger's recommendation (Doc. 39-3, p. 71) (Doc. 35-2, p. 110-11). According to Spanberger, he

had decided to recommend Mangum for termination prior to the October 9 PIP meeting, but he was awaiting formal approval from U.S. Steel's human resources department (Doc. 35-1). U.S. Steel does not allege that Mangum committed any more safety violations between her October 9 PIP meeting and her termination.

When viewing the record in the light most favorable to Mangum, a reasonable jury could determine Mangum was meeting U.S. Steel's legitimate employment expectations at the time of her termination. The evidence also casts doubt on whether U.S. Steel honestly believed Mangum was violating its safety policy.

"[A] plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994). "A detailed refutation of events which underlie the employer's negative performance assessment demonstrates that the employer may not have honestly relied on the identified deficiencies in making its decision." *Id.* at 1460-61.

Here, Mangum either denies that certain events took place or she specifically states why she believes that she acted appropriately under the circumstances. One such example is the August 12 incident when she says severe weather prevented her from completing the lock out paperwork and McBride said nothing when she asked if she could leave the office (Doc. 35-2, p. 87-88). Further, Mangum testified she discussed the August 13 incident with McBride and told him she was not breaking safety protocol because the mill was still locked out and she was not required to lock the mill for an inspection (Doc. 39-2, p. 88-90). Also, at the October 9 PIP meeting, Mangum explained to McBride, Spanberger, and Kachigian that the October 8 incident never occurred and

that she had paperwork to substantiate her version of events (Doc. 35-2, p. 104). U.S. Steel does not attack the merits of Mangum's explanations and it does not introduce the safety policy, itself, for clarification. Instead, U.S. Steel paraphrases the safety policy with vague and conclusory statements of its requirements. Given the conflicting version of events, and the conflicting interpretations of the safety policy, there are genuine disputes of material facts as to whether Mangum violated U.S. Steel's safety policy and whether U.S. Steel honestly believed Mangum violated its policy.

U.S. Steel's inconsistent reviews of Mangum's performance also undermine the veracity of U.S. Steel's stated reason for her termination. To establish pretext, a plaintiff can point to "weaknesses, implausibility, inconsistencies, or contradictions" in the defendant's asserted reason for the plaintiff's termination. *Coleman*, 667 F.3d at 852. Here, U.S. Steel states it terminated Mangum for failing to successfully complete the PIP. However, Spanberger reported that Mangum was "progressing sufficiently" with the PIP, even after she allegedly committed two safety violations (Doc. 39-4). Also, after Mangum allegedly committed the third violation, Kachigian told Mangum she had not committed any "fireable offenses" (Doc. 39-1, p. 109-110). But then Mangum was terminated that same day, without committing any additional violations. Spanberger claims he decided to recommend Mangum for termination prior to the October 9 PIP meeting, but Spanberger did not speak out when Kachigian told Mangum that her alleged safety violations were not "fireable offenses." These inconsistencies create a genuine dispute of material fact as to whether Mangum was meeting U.S. Steel's

employment expectations and whether U.S. Steel honestly believed its stated reason for Mangum's termination.

Also, Mangum has introduced evidence that raises the inference that U.S. Steel enforced its rules against her more harshly than similarly situated male and white employees. "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner...the second and fourth prongs of *McDonnell Douglas* merge-allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Additionally, the Supreme Court has found that evidence of the selective enforcement of rules against one gender or race but not another is relevant to establishing pretext. *Coleman*, 667 F.3d at 857-58. Here, Mangum testified that she witnessed Jarvis and Steinmeyer, two white male Shift Managers, fail to lockout while on the mill (Doc. 39-1, p. 46-47). Mangum reported these violations to Spanberger (*Id.* at p. 46), but Spanberger did not place Jarvis or Steinmeyer on a PIP (*Id.* at p. 68).

In sum, Mangum's evidence that U.S. Steel selectively enforced its rules based on race and gender, her evidence that U.S. Steel reported she was sufficiently progressing with the PIP and had not committed any "fireable offenses," and Mangum's detailed refutation of the alleged safety violations is enough to survive summary judgment. It is enough that a reasonable jury may infer discrimination. U.S. Steel's request for summary judgment on Mangum's discrimination claims is denied.

## B. Retaliation

Title VII and the IHRA prohibit an employer from retaliating against an individual for opposing an unlawful employment practice. *See* 775 ILCS 5/6-101(A); 42 U.S.C. § 2000e-3(a). When evaluating a claim for retaliation at the summary judgment stage, the Court considers whether the evidence could permit a reasonable factfinder to conclude the plaintiff's protected activities caused the adverse employment action. *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017); *see also Ferrill v. Oak Creek-Franklin Jont Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) ("To prevail on a retaliation claim requires proof that the desire to retaliate was the but-for cause of the challenged employment action.").

> There are two ways of proving a *prima facie* retaliation claim and each requires proving different elements. A plaintiff opting for the "direct" method must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). The "indirect" method, as the name implies, allows the plaintiff to establish a *prima facie* case without establishing a causal link. This method requires a plaintiff show (1) she engaged in a protected activity, (2) she performed her job duties according to her employer's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated employees who did not engage in the protected activity. *Id.* The indirect method falls under the auspices of the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

As an initial matter, U.S. Steel argues that Mangum has attempted to impermissibly amend her retaliation claims through the summary judgment briefing. *See Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary

judgment."). Specifically, U.S. Steel contends that Mangum argues for the first time in her opposition brief that she was retaliated against for attempting to make a formal complaint of discrimination on October 9, the day she was terminated. U.S. Steel's argument is misplaced. Mangum's Complaint expressly alleges, "Defendant retaliated against Plaintiff for complaining about racial and gender discrimination" and "[a]fter Plaintiff requested to make a formal complaint in writing, Plaintiff was terminated the same day" (Doc. 1, ¶¶ 25-26).

U.S. Steel's argument hinges entirely on cherry-picked portions of Mangum's deposition testimony, where she appears to testify that her retaliation claim is only based on reporting safety violations and assisting Callaway with his discrimination claim (Doc. 39-2, p. 124, 185, 187 & 188). U.S. Steel essentially argues that, based on her testimony, Mangum can only proceed on these theories and has waived an argument of retaliation regarding her complaint on October 9. However, Mangum's Complaint does not allege she faced retaliation for reporting safety violations. Her Complaint advances retaliation theories based on reporting discrimination and assisting Callaway with his discrimination complaint. "A plaintiff may testify in a manner that dooms [her] claim on the merits, but unfavorable deposition testimony does not amend the complaint." *Stepp v. Covance Central Laboratory Services, Inc.*, 931 F.3d 632, 634 (7th Cir. 2019). But even so, Mangum never conceded at her deposition that U.S. Steel did not retaliate against her for attempting to report discrimination. In fact, Mangum testified she told Kachigian she wanted to make a "formal complaint" about a "toxic environment" and she was terminated later that day (Doc. 39-1, p. 80-81). U.S. Steel's argument has no merit, and it

is not entitled to summary judgment on this basis. Similarly, the Court will not address U.S. Steel's arguments related to Mangum reporting safety violations, because Mangum has never advanced this theory in her pleadings and she does not contend to now.

Next, U.S. Steel argues Mangum's complaint to Kachigian on October 9 does not constitute protected activity because Mangum only made a general complaint that did not reference a protected characteristic. Under either the "direct" or "indirect" method of proof, a plaintiff must establish she engaged in a protected activity. *See Swyear*, 911 F.3d at 885. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient to state a claim for retaliation." *Hoosier v. Greenwood*, 32 F. Supp.3d 966, 982 (N.D. Ill. March 26, 2014) (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003)).

Here, Mangum testified she attempted to report discrimination at the October 9 PIP meeting. When asked to recall exactly what she said to Kachigian, Mangum testified that she stated, "I'd like to speak [to] someone about a volatile work environment and. . .I don't want Joe [Spanberger] or Jordan [McBride] present during this conversation" (*Id.* at p. 82-83). Although Mangum did not specifically mention race or gender to Kachigian, Mangum argues that her prior complaints to McBride made it "clear to U.S. Steel" that her October 9 complaint related to race and sex discrimination (Doc. 40, p. 8). Specifically, Mangum often complained to McBride that she was treated unfairly as a black woman (Doc. 39-2, p. 60-61). However, there is no evidence of the content of Mangum's complaints to McBride. Further, McBride testified Mangum never complained of a

specific instance of racial or sex discrimination at work and he was unsure whether Mangum was complaining about discrimination at U.S. Steel or "generally in life" (Doc. 46-1, p. 93-94). McBride's deposition transcript provides the following:

> **Q    Mr. McBride, do you remember testifying today about Ms. Mangum stating to you from time to time that she is treated unfairly because she was a black female?**
>
> A    I do.
>
> **Q    When she made those statements to you about being treated unfairly, did you understand Ms. Mangum to be stating that she was being treated unfairly at U.S. Steel or just generally in life?**
>
> A    I don't know. She never gave me any specific instance in regards to what you're asking. I don't know.
>
> **Q    Let me ask you about that. When she would state that she was being treated unfairly, did you ask for examples?**
>
> A    Yes.
>
> **Q    Did she ever provide you any examples?**
>
> A    No.
>
> **Q    When she would make statements that she was being treated unfairly, why did you not report that to your supervisor or HR?**
>
> A    Every time I asked for an example of what she was talking about, I never got one. Other than that, I didn't have anything to report to HR.

(*Id.*).

Neither Mangum's complaints to McBride nor her complaint to Kachigian are sufficient to establish that Mangum engaged in protected activity on October 9. Mangum has not produced any evidence that the individuals responsible for her termination were actually aware that her complaints concerned discrimination she endured at U.S. Steel

based on her race or sex. Mangum claims, without any evidentiary support, that U.S. Steel knew her October 9 complaint concerned race and gender because of her previous complaints to McBride. However, when evaluating retaliation claims, the Court does "not consider what employers should have known about complaints, and instead hold[s] them responsible for what the record shows they actually knew." *Swinney v. Illinois State Police*, 332 Fed. App'x 316, 318 (7th Cir. 2009). Further, McBride testified Mangum would not explain the instances of discrimination and she never stated whether the discrimination occurred at U.S. Steel. Thus, no reasonable jury could find that Mangum's complaints constituted a protected activity for purposes of her retaliation claim. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007-08 (7th Cir. 2000) (where a complaint concerning a "general displeasure with being paid less" was not protected activity even though the plaintiff made previous complaints of pregnancy discrimination to her supervisors).

Also, U.S. Steel argues Mangum cannot establish a causal nexus between Mangum's participation in Callaway's discrimination claim and Mangum's termination. Mangum testified at her deposition that she was "not sure" and "did not know for certain" whether Spanberger or McBride were aware that she offered to make a statement on behalf of Callaway (Doc. 39-1, p. 186-87). However, Mangum testified she "had every reason to believe that" her support for Callaway "had gotten back to" Spanberger and McBride because "in that environment, it seemed like nothing was confidential" (Doc. 39-1, p. 186). Mangum's speculation and conjecture is insufficient to establish a causal connection or inference between her protected activity and her termination. *See Campbell v. Dominick's Finer Foods, Inc.*, 85 F. Supp. 2d 866, 875 (N.D. Ill. 2000) ("Plaintiff argues

without support that 'everyone was aware of what happened' and 'it is not unreasonable to believe that [his managers] knew [of the discrimination].' But Plaintiff's speculation and conjecture is insufficient to establish a causal connection or inference…") (internal citations omitted).

Additionally, under the indirect method of proof, Mangum has not identified a single similarly situated employee who did not support Callaway's discrimination claim and who was treated more favorably than Mangum. Instead, she vaguely contends she was treated "less favorably than similarly situate[ed] employees who did not report discrimination" (Doc. 40, p. 9). Mangum's argument in opposition to U.S. Steel's summary judgment motion on this point is too conclusory and underdeveloped to permit the Court to find in her favor. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (claims not addressed in a summary judgment opposition brief are deemed abandoned). Thus, Mangum's claim that she was retaliated against for supporting Callaway's discrimination complaint fails under either the direct or indirect method of proof.

In sum, Mangum advances retaliation claims based on her October 9 complaint and her assistance with Callaway's discrimination claim. However, Mangum's general complaints about a volatile work environment on October 9 made no reference to discrimination based on her race or gender. Thus, no reasonable jury could infer that she engaged in a protected activity. Further, Mangum does not contest, and therefore concedes, that there is no evidence to establish that her support of Callaway's discrimination claim caused her termination. For these reasons, Mangum's retaliation

claims fail as a matter of law and U.S. Steel is entitled to summary judgment on these bases.

<h3 align="center">CONCLUSION</h3>

For the foregoing reasons, the Motion for Summary Judgment filed by U.S. Steel is **GRANTED** in part as to Mangum's retaliation claims under Title VII and the IHRA. The Motion for Summary Judgment is **DENIED** in part as to Mangum's discrimination claims under Title VII and the IHRA.

In light of this Memorandum and Order allowing a portion of Plaintiff's case to proceed to trial, the parties will be **REFERRED** to the Court's mandatory mediation program and the parties will be expected to engage in mediation in good faith. An Order referring this case to mediation will be issued by separate notice. The Court will also set a status conference to discuss the scheduling of a trial.

**IT IS SO ORDERED.**

**DATED: March 18, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**